Archie Weldon VAN SICKLE, Appellant,

v.

The STATE of Texas, State.

No. 2–81–109–CR.

Court of Appeals of Texas, Fort Worth.

June 9, 1982.

Discretionary Review Refused Sept. 15, 1982.

Burleson, Pate & Gibson, and Phil Burleson, Dallas, for appellant.

Tim Curry, Dist. Atty. and C. Chris Marshall, Asst. Dist. Atty., Fort Worth, for State.

Before HUGHES, HOLMAN and RICHARD L. BROWN, JJ.

## OPINION

HUGHES, Justice.

Archie Weldon Van Sickle, who was convicted of murder and assessed punishment at life imprisonment in the Texas Department of Corrections, has appealed.

We affirm.

Testimony in this case reflects that Mark Slocum was found inside his store on the morning of April 24, 1979. He was dead from 40 ice pick stab wounds in his head and body. Three of the wounds pierced his heart.

Inez Slocum, widow of the victim, last saw him alive at 9:10 a.m., April 24, 1979, when he was waiting on a customer at their convenience store in the country close to Rendon, Texas.

At or about 9:45 a.m. the same day Carol Schwobel saw a large white man in dark

clothes (including a bulky jacket) chase a smaller white man in light clothes out of Slocum's store. The large man caught the smaller man and carried him back into the store. She went to appellant's store which was across the street from Slocum's and found it locked. At that place she could see the large man making striking motions at something on the floor of Slocum's store just inside the door. She could not say positively that the man was the same man she saw outside.

Ms. Schwobel also testified that she wrote down the license number of a red and white vehicle parked in front of Slocum's store (CXZ–650). Also she wrote the number of a blue vehicle parked there. Thence, she drove down the road and told some Highway Department employees what had happened.

Another witness, Harry Clark, testified to arriving at Slocum's store at about 9:45 a.m. and finding the door held shut by "the bloodiest hand ever seen". He saw a red over white vehicle where he parked at the store. He also saw a man go from Slocum's store to such vehicle carrying something. The man got into the vehicle and drove north on 1088. Mr. Clark then went back to Slocum's store and found Slocum's body inside same.

Three people testified to seeing a white over red vehicle going south on 1088.

Two of the men were Sheriff's deputies (Creed and Toy) who passed the vehicle bearing license number CXZ–650. They had received a radio transmission about the killing at 9:47 a.m.

The third man, also a Sheriff's deputy (Lieutenant Sanders) saw the vehicle a few minutes later still headed south on 1088. He turned his automobile around and followed the vehicle to where it turned in a driveway of a house about .2 miles from Slocum's store. This turned out to be a rent house of appellant. Lt. Sanders testified that he saw appellant leave the vehicle near the house. He carried an ice pick in his left hand and a shotgun in his right hand with two coats in his arms. As appellant reached the porch of the house, Lt.

Sanders drew his revolver and told him to stop and drop the gun. Appellant then threw down the gun and the other enumerated articles. He was nervous when arrested, perspiring considerably and breathing hard. His hands and clothes were stained with blood.

Lt. Sanders took possession of the items thrown on the ground by appellant. The point of the ice pick was broken off and its handle had damp blood on it. Later, during the autopsy of Slocum's body, a piece of metal fell out of his skull. Dr. Irving Stone testified it was the broken tip of the ice pick. Of four tests made on the handle of the ice pick three showed the blood on it to match Mr. Slocum's. Mr. Slocum had rare type A blood. Appellant had type O blood.

Blood tests were also run on the jackets. One, a tan jacket showed a match of Mr. Slocum's blood in all eight tests performed on it. Three of the tests were also consistent with appellant's blood. Sally Williams, a serologist who testified, said there was one drop of type O blood on the tan jacket and all the other stains were type A. In addition to the ice pick and the tan jacket, Ms. Williams testified that the appellant's shirt had A-positive blood on it. She also testified that human blood was on appellant's pants and boots and on two of the currency bills found in the tan jacket, but the blood could not be more specifically tested.

Appellant testified. He offered an alibi. He was hunting rabbits at the time of the murder. He testified that he was at the farm of China Lewis at 9:15 a.m. on the date of the killing. Mr. Lewis said appellant arrived at his farm between 9:25 a.m. and 9:28 a.m. This farm was 10 minutes away from Slocum's store. He said he shot one rabbit with the one shotgun shell he carried hunting with him. The rabbit bled extensively. He took the rabbit with him when he left, putting its bloody carcass on a rag in his automobile. He threw it to a dog at the rent house.

Appellant further testified that he picked up the ice pick and the two coats from the

side of the highway. He had spied them while driving from Lewis' farm and turned his vehicle around to pick them up. He thought the moistness on the ice pick handle was paint. He saw a $5.00 bill in the pocket of the tan coat. A pocket of the tan coat contained some paper money (some bloodstained), a pair of Slocum's spectacles, and two shotgun shells. Two bank bags were wrapped in the coats. The bags contained money and notes from Sheri Tucker to Slocum. Blood speckled the door handle of appellant's vehicle but no blood was found on the steering wheel. Appellant, at the time of his arrest, had what appeared to be blood on his hands and shirt. He rubbed his hands on his trousers constantly. Officer Lane testified that appellant had a cut on his ear that Lane described as a prick. Appellant said he cut his ear on a thorn and tried to stop the bleeding several times with his hands. He also said the blood soaking the mat in the floor of his pick-up was from his ear.

By Ground of Error Number Nine appellant insists that the evidence is insufficient to support the verdict of guilty. We disagree. Witnesses for the State and the appellant gave widely divergent accounts of the events at Slocum's store on the morning of April 24, 1979. The jury believed the State's witnesses and so said by its verdict. *Johnson v. State*, 571 S.W.2d 170 (Tex.Cr. App.1978). Their verdict is understandable in the light of the testimony concerning the ice pick in appellant's hand, the A-positive blood on his shirt, the Slocum's bank envelopes with the bloodstained money in his possession and the red and white vehicle at the scene of the crime with his license number. Add the appellant's unhappiness with losing customers to Mr. Slocum and motive appears. Evidence favorable to the verdict in this case sustains it. *Ahearn v. State*, 588 S.W.2d 327 (Tex.Cr.App.1979).

We overrule what appellant designates as his Ground of Error Number Nine.

The testimony of Gordon Rainey, put on in the State's rebuttal, is the basis of Grounds of Error One through Five. In essense they state that such testimony was extraneous to the offense on trial, was remote, and the harm caused far outweighed any probative value. Appellant argues that Rainey should not have been permitted to testify that:

Ground One—Appellant conspired with him to burn down the Slocum's store;

Ground Two—Appellant asked him to rob the Slocum's store and blow it up with dynamite after it was rebuilt;

Ground Three—Appellant tried to get him to rob Slocum's store and kill Herschel Tucker (Slocum's grandson and manager of Slocum's store);

Ground Four—Appellant conspired with him to commit a robbery of the Slocum's at their home; and

Ground Five—At appellant's urging, he attempted a robbery of the Slocums, during which Mrs. Slocum was shot.

Rainey testified that:

After meeting appellant in December 1976 he rented a house from him four miles from appellant's store.

April, 1977—Appellant offered him two months' rent to burn down Slocum's store.

May 27, 1977—Appellant told him and two friends how to set fire to Slocum's store with 6 gallons of gasoline stored in a junk car near appellant's store. Later that night Rainey and his two friends burned the store down and damaged a nearby feed barn. Appellant praised Rainey the next day for his good work.

A week passed—Appellant told Rainey that Slocum was underpricing him on beer and explained how to put the Slocums out of business by robbing them and dynamiting any store they might rebuild.

A month passed—Appellant told him of a plan for Rainey, et al· to kill Herschel Tucker and rob the store.

August 7 or 8, 1977—Appellant tried to get him to lure Slocum into helping a "stranded motorist" and then shoot Slocum.

August 13, 1977—Pursuant to appellant's solicitation to rob, torture and murder the Slocums, Rainey, et al attempted to so do at

the Slocum's home with Mrs. Slocum and one of the trio of intruders being shot.

Pass two days—Appellant asked Rainey about the "good news".

The trial judge admitted Rainey's testimony on the basis of Section 19.06 of the Penal Code, which reads:

"In all prosecutions for murder or voluntary manslaughter, the state or the defendant shall be permitted to offer testimony as to all *relevant* facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all *relevant* facts and circumstances going to show the condition of the mind of the accused at the time of the offense." [Emphasis ours.]

"Previous relationship between the accused and deceased" is a key phrase in Section 19.06, as is "*the state* or the defendant shall be permitted to offer testimony." [Emphasis ours.] Rainey testified to a protracted scheme of appellant to put his competition, Slocum, out of business by fire, robbery, theft, murder and dynamite, all less than two years before he was permanently put out of business by way of murder. We consider Rainey's testimony as relevant in this case as showing animus and motive and state of mind. *Alford v. State*, 505 S.W.2d 813 (Tex.Cr.App.1974); *Dunlap v. State*, 462 S.W.2d 591 (Tex.Cr.App.1971); *Shaw v. State*, 530 S.W.2d 838 (Tex.Cr.App. 1976).

We overrule Grounds of Error One through Five.

■ Ground of Error Number Six asserts that Section 19.06 of the Penal Code is unconstitutional to the extent that it is interpreted as allowing proof of extraneous offenses without any further showing of relevance and materiality. Section 19.06, by its very terms, limits itself to relevant facts and circumstances. We overrule the sixth ground of error.

■ By Ground of Error Number Seven appellant avers, in essence, that Rainey's testimony was insufficient because he was an accomplice and he was not corroborated.

We hold that, since there is no evidence in the record to show Rainey to be an accomplice in the instant case, there is no necessity for his corroboration. *Matthews v. State*, 471 S.W.2d 834 (Tex.Cr.App.1971); *Washburn v. State*, 167 Tex.Cr.App. 125, 318 S.W.2d 627 (1958). We overrule Ground of Error Number Seven.

■ We also overrule the second Ground of Error Number Seven which states the evidence to have been insufficient to prove an arson on appellant. In the first place the only objection made to the arson testimony was that it was too remote in time. Certainly appellant made no objection to the testimony on the basis of corroboration, nor did he ever move to strike it for that reason. We hold the twenty month period between the occurrence of the matters involved in Rainey's testimony and the murder not to be too remote in time for their admission. At any rate appellant urged remoteness only once and did not urge it as to later Rainey-Van Sickle conversations recounted by Rainey in his testimony. He waived the alleged error as to the later conversations. *Crocker v. State*, 573 S.W.2d 190 (Tex.Cr.App.1978); *Sherbert v. State*, 531 S.W.2d 636 (Tex.Cr.App.1976). Also, Rainey was corroborated to the extent that the fire occurred when he said it did on May 27, 1977 (by Mrs. Slocum, Herschel Tucker and several firemen).

■ By his eighth ground of error appellant asserts that the trial court erred in excluding evidence, offered through appellant's wife, to the effect that Herschel Tucker and deceased had been heard arguing on several prior occasions. Appellant and T. J. Harman also testified that Tucker had a fight with Slocum on the morning of the murder; that Tucker knocked Slocum down, and carried him into the Slocum store after telling Slocum he was going to kill him. The jury chose to believe Tucker and his wife were 67 miles away at the time as testified by Steve and Alma Holub and Clinton Hunter.

Pursuant to a motion in limine granted in favor of the State, a hearing was held out-

side the presence of the jury as to the admissibility of testimony to be given by appellant's wife. During the hearing appellant's wife testified that she had observed deceased and Herschel "fussing" five or six times within an eighteen month period before trial. She didn't remember when the times were nor could she understand what they were saying. She "could just tell they were fussing". When asked whether the voice tones were friendly or unfriendly, she responded:

"A. No. At these times they wouldn't be, but they seemed to have got along real well and I didn't see this too many times."

At the conclusion of the hearing, the trial court ruled this testimony to be inadmissible.

Appellant cites *Wilkes v. State*, 103 Tex. Cr.R. 148, 280 S.W. 786 (1926) for this proposition:

"In a case of circumstantial evidence, every reasonable hypothesis should be explored, and evidence which tends to show that another and not the accused committed the offense, or which may create in the minds of the jury a reasonable doubt as to the identity of the slayer, should not be rejected, unless it is remote to a degree that it is of no weight." 280 S.W. at 787.

In *Wilkes* the question was one of whether the evidence raised an issue as to the identity of the slayer so as to require an instruction to the jury. However, the quoted passage is pertinent to our inquiry.

As stated in *Wilkes*, every reasonable hypothesis should be explored in a case of circumstantial evidence. The hypothesis that Tucker committed the murder was afforded reasonableness because a witness, Harmon, testified that on the morning of the killing he had seen Tucker assaulting the deceased; thus a "proximate connection" was made between any hostility which existed and the killing. *Taylor v. State*, 87 Tex.Cr.R. 330, 221 S.W. 611 (1920).

Nevertheless, we fail to see how the evidence offered as to Tucker's having "fussed" with the deceased was of proba-

tive value. Appellant's wife herself testified that the two normally co-existed well. Moreover, she never heard what was said so the matter of whether the two were actually fussing was merely speculative. Her personal knowledge was limited to the voice tones. Thus, even though it may have been error to exclude the testimony, any such error was harmless.

We affirm.