Peter Alan WERNER, Appellant,

v.

The STATE of Texas, Appellee.

No. 01–83–0069–CR.

Court of Appeals of Texas,
Houston (1st Dist.).

Oct. 4, 1984.

Rehearing Denied Nov. 21, 1984.

David Berg, Houston, for appellant.

John B. Holmes, Jr., Harris County Dist. Atty., William J. Delmore, III, Norma Davenport, Harris County Asst. Dist. Attys., Houston, for appellee.

Before DOYLE, DUGGAN and LEVY, JJ.

## OPINION

DOYLE, Justice.

This is an appeal from a conviction of murder. Punishment was assessed by a jury at ten years.

The record reflects that appellant shot and killed Tarbell Griffin Travis, after Travis allegedly damaged an automobile owned by appellant's friend, Kenneth Netterville.

While visiting at Netterville's residence, appellant saw a car driven by the deceased collide head-on with Netterville's parked vehicle. The deceased immediately backed off all the way to the intersection and sped away. Appellant and Netterville decided to give chase, and hold "whoever hit the car for the police." According to appellant's testimony, the following events next happened. Upon overtaking the deceased's vehicle, appellant, carrying a pistol and a flashlight, approached the deceased and allegedly told him to "get up against the car." When the deceased allegedly made a movement with his shoulders and stepped toward appellant, appellant shot the deceased in the chest from a distance of approximately eight feet. Appellant was charged by indictment with the offense of murder.

In the first of four grounds of error, the appellant contends that the trial court erroneously charged the jury on the use of deadly force to make an arrest.

The trial court included the following instruction in its charge to the jury.

A person other than a peace officer acting in a peace officer's presence and at his direction is justified in using deadly force against another when and to the degree the person reasonably believes the deadly force is immediately necessary to make a lawful arrest, if the use of force would have been justified, and the defendant reasonably believes the offense against the public peace for which arrest is authorized included the use or attempted use of deadly force; or the defendant reasonably believes there is a substantial risk that the person to be arrested will cause death or serious bodily injury to another if the arrest is delayed.

The appellant argues that this instruction confused the jury, because there was no evidence that appellant used deadly force in his attempt to make the arrest or that he acted in the presence and at the direction of a police officer. The appellant also argues that the instruction was a comment on the weight of the evidence, because appellant did not *claim* that he used deadly force in order to make the arrest, merely that he threatened the victim with deadly force in order to effect an arrest.

■ When determining reversible error, the reviewing court normally looks to the part of the court's charge that applies the law to the facts. *Thomas v. State*, 587 S.W.2d 707 (Tex.Crim.App.1979). Where a broad definition or abstract definition is used in the definitional portion of the charge, the court seldom finds reversible error or error which is calculated to injure the rights of appellant, or render the trial unfair. See *Jones v. State*, 576 S.W.2d 393 (Tex.Crim.App.1979); *Pulgarin v. State*, 635 S.W.2d 195 (Tex.App.—Houston [1st Dist.] 1982, no writ).

■ In contrast, if the charge authorizes the jury to convict upon a set of circumstances that could not constitute the offense charged, or are not supported by the evidence, the reviewing court will find reversible error. *Dowden v. State*, 537 S.W.2d 5, (Tex.Crim.App.1976); *Venzor v. State*, 283 S.W.2d 397 (Tex.Crim.App.1955); *but cf. Toler v. State*, 546 S.W.2d 290 (Tex. Crim.App.1977).

In the instant case, the application paragraph of the charge authorized the jury to convict only if they believed appellant was guilty of murder.

Therefore, if you believe from the evidence beyond a reasonable doubt that the Defendant, Peter Alan Werner, on or about April 2, 1982, in Harris County,

Texas, intentionally or knowingly caused the death of Tarbell Griffin Travis by shooting him with a firearm, you *will find the Defendant guilty of Murder.* If you do not so believe, or have a reasonable *doubt thereof, you will find the Defendant not guilty.* (emphasis added)

The court's charge also instructed the jury on the issue of self-defense, and authorized the jury to find either for or against appellant on this issue:

If you find from the evidence beyond a reasonable doubt that at the time and place in question the Defendant did not reasonably believe that he was in danger of death or serious bodily injury, or that a reasonable person in the Defendant's situation at the time and place in question would have retreated before using deadly force against Tarbell Griffin Travis, or that the Defendant, under the circumstances, did not reasonably believe that the degree of force actually used by him was immediately necessary to protect himself against Tarbell Griffin Travis's use or attempted use of unlawful deadly force, if any, as viewed from the Defendant's standpoint at the time, *then you must find against the Defendant on the issue of self-defense.*

Now if you find or have a reasonable doubt thereof that Tarbell Griffin Travis committed a breach of the peace as those terms have been defined herein, in the presence or in the view of Peter Alan Werner; and if you further find or have a reasonable doubt thereof that Peter Alan Werner reasonably belived [sic] his purpose and the reasons for his arrest of Tarbell Griffin Travis were already known to him, or the purpose could not reasonably be made known to him; and if you further find from the evidence beyond a reasonable doubt that the Defendant, Peter Alan Werner, did kill the said Tarbell Griffin Travis by shooting him with a gun as alleged, but you further find from the evidence or have a reasonable doubt thereof that, viewed from the standpoint of the Defendant at the time, from the words, conduct, or both, of Tarbell Griffin Travis, it reason-

ably appeared to him that the Defendant's life or person was in danger and there was created in his mind a reasonable expectation or fear of death or serious bodily injury, or he reasonably believed he was under attack or attempted attack from the use of unlawful deadly force at the hands of Tarbell Griffin Travis, and that acting under such apprehension and reasonable belief that the use of deadly force on his part was immediately necessary to protect himself against Tarbell Griffin Travis's actual or apparent use of unlawful deadly force, he shot the said Tarbell Griffin Travis, and that a *reasonable person in the Defendant's situation would not have retreated, then you should acquit the Defendant on the grounds of self-defense;* or if you have a reasonable doubt as to whether or not the Defendant was *acting in self-defense on said occasion and under the circumstances, then you should give the Defendant the benefit of that doubt and say by your verdict not guilty.* (emphasis added)

The record indicates that the part of the court's charge that applies the law to the facts was properly restricted to cover the offense charged, and the defensive issues raised at trial. Throughout the trial, appellant's defense to the murder charge was that he was justified in using a certain amount of force to effect an arrest Tex.Penal Code 9.51(b), but that he shot the deceased in self-defense. The application paragraphs of the charge clearly only reflect these two theories. Therefore, the inclusion of the definition of when "deadly force" may be used by a person attempting an arrest was harmless. Ground of error one is overruled.

In the second ground of error, appellant contends that the trial court erred in refusing to allow appellant to introduce evidence on the condition of appellant's mind at the time of the offense.

During the guilt-innocence phase of the trial, the court sustained the state's motion in limine, prohibiting appellant from intro-

ducing the testimony of Dr. Roden, a psychiatrist who had treated descendents of survivors of concentration camps and Officers Hartman and McErland, the officers who arrested appellant at the scene shooting. The officers were allowed to testify to all facts and circumstances surrounding the killing except the conversation between the appellant and them concerning the Holocaust. Appellant contends that these three witnesses' testimony would tend to show the condition of the mind of the appellant at the time of the offense and that such testimony should have been permitted under the Texas Penal Code sec. 19.06 (Vernon 1974) which reads:

Section 19.06. Evidence

In all prosecutions for murder or voluntary manslaughter, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

 The key word in the foregoing statute is "relevant." Whether the evidence sought to be introduced is relevant, is a matter of law and must be determined by the trial court. Such a determination will not be disturbed on appeal unless an abuse of discretion is shown. The trial court's decision to exclude, as irrelevant, the Holocaust testimony of the appellant and other witnesses as showing the appellant's state of mind at the time of the offense, was based on testimony of Dr. Roden and Officers Hartman and McErlane as set out in the bill of exceptions. Dr. Roden would have testified that Peter deeply believed people should have the "strength to protect" themselves, and was determined not to be intimidated, as his relatives had been, in similarly dangerous situations. Dr. Roden would have also testified that these were appellant's subconscious thoughts, even though appellant had told him that he was not thinking about the Holocaust at the time of the offense. He would have also testified that he is a board-certified psychiatrist and holds a medical degree and various other degrees. He would have further testified that his professional experience includes frequent lectures given to organizations and groups of children of Holocaust survivors. He has spoken with Houston groups of children of survivors of the Holocaust. He has conducted seminars in pre-Freudian and Freud, Freud's general psychological theory, male chauvinism, survivor syndrome, and survival. Dr. Roden would also testify that he himself was incarcerated in German concentration camps from the years 1940 to 1945.

Dr. Roden would have testified that beginning in August of 1982, he began to see Peter Alan Werner as a patient. He has since seen him on eighteen or nineteen separate occasions, two or three occasions of which, maybe more, he also saw Peter with his father, mother, brother, and sister; that he has determined that Peter is, in fact, an example of an individual who shows some of the characteristics of an individual who has the syndrome associated with children of survivors of Nazi concentration camps; the way that it is manifested in Peter Werner might be exhibited as follows: Peter Werner grew up with the stories of concentration camps, not only from his dad but also from his grandmother who lived with him and he thinks still lives with them, or did live with them during Peter Alan Werner's formative years and only recently has moved into a home for the aged; that during the period of time when he was growing up, Peter Werner was told all the stories of what his father had seen in the Holocaust; and that most important to Peter was that his father and his grandmother told him of seeing people beaten to death who did not fight back; and of people who were taken to Theresienstad, a concentration camp where Peter's father spent most of his time as an internee.

Dr. Roden would have testified that Peter has told him everything that happened at the scene that night. Dr. Roden would have testified that one does not need to be

thinking of an event for another event in one's life to have an effect, a subconscious effect on him. For instance, Peter testified that at the moment he pulled the trigger, he wasn't thinking about anything except protecting himself. Peter feels that the greatest injustice in the history of man was perpetrated against his family and against his people. Peter has a great deal of feeling for the injustice perpetrated against others, and among them, the two or three million Americans who died at the hands of the Turks. Dr. Roden would have testified that those feelings were a result of Peter's experiences, the experiences related to him by his father and his grandmother, and as a result of that, he had made the decision that if his life were threatened, he would act to protect himself.

Dr. Roden would have also testified that, in his professional opinion that is precisely what happened on the night or the early morning hours of April 2, 1982; that these things came to bear, brought themselves to bear on Peter, even though at the moment that it happened he wasn't thinking about the Holocaust; and that it was his state of mind to defend himself because he comes from a family that did not.

Officers Hartman and McErland would have testified that while appellant was handcuffed, appellant made statements which related to his empathy for Jews during World War II. Appellant also stated that his father had been a victim of the Holocaust, and that he would be ashamed if he could see appellant under arrest. According to Officer Hartman, appellant stated that his father had witnessed people going into gas chambers, without argument. Accordingly, appellant said that he had always planned to protect himself with guns.

In sustaining the state's objection to the proffered testimony, the court stated:

THE COURT: In light of the Defendant's testimony, the fact that there is no legal authority at all for such testimony coming before the jury, and because there are no two people alike, everybody is different, everybody comes from a different background, different things happen in their past, because there is no special breed of people that should be treated differently, all must come within the standard of the law that we have in the state of Texas, and although the Holocaust is an example of man's inhumane acts towards their fellow man, the Court is going to sustain the objection at this time.

■■■ Appellant has raised the issue of self-defense. Where self-defense is raised, the issue before the jury is whether or not appellant had a reasonable belief that he is under unjustifiable attack as viewed from his standpoint at the time he acted. Texas Penal Code sec. 9.31(a); *Kolliner v. State*, 516 S.W.2d 671 (Tex.Crim.App.1974). The danger need not be real. The right of self-defense exists if it appears real to the accused. *Jones v. State*, 544 S.W.2d 139 (Tex.Crim.App.1976). The term "reasonable belief" is defined as a belief that would be held by an ordinary and prudent man in the same circumstances as the actor. Texas Penal Code sec. 1.07(a)(31). Therefore, the question as to whether appellant believed he was in danger, real or apparent, viewed from his standpoint at the time he acted, is based on what an ordinary and prudent man would have believed under the same circumstances, not of what the descendent of a Holocaust survivor may have believed, as contended by appellant. Accordingly, Dr. Roden's testimony as to the effect of being a descendent of a survivor of the Holocaust had upon appellant as to his reasonable belief of danger, was not relevant on the issue of self-defense.

We have been cited to no authority, nor can we find any which holds that *all* testimony, regardless of relevancy or materiality, is admissible under sec. 19.06 if it relates to facts and circumstances going to show the relationship between the accused and the deceased and the condition of the mind of the accused at the time of the offense. In every case cited by appellant, where testimony concerning his state of mind was admitted, the courts first found

relevancy. In *VanSickle v. State*, 634 S.W.2d 946 (Tex.App.—Fort Worth 1982, P.D.R. ref'd), the accused had been convicted of murder. He objected to the admission of testimony which showed that he had conspired to burn the victim's store; had tried to hire someone to rob it and blow it up with dynamite if rebuilt; and had done several other acts directed toward putting the victim out of business. The accused argued that sec. 19.06 was unconstitutional because it allowed such extraneous offenses into evidence. The Fort Worth Court of Appeals affirmed with this observation:

> Ground of Error Number Six asserts that Section 19.06 of the Penal Code is unconstitutional to the extent that it is interpreted as allowing proof of extraneous offense without any further showing of relevance and materiality. *Section 19.06, by its very terms, limits itself to relevant facts and circumstances.* We overrule the sixth ground of error. (Emphasis added)

Appellant relies heavily on the *McClure* case as authority for the admission of the testimony of Dr. Roden and the police officers. In *McClure v. State*, 575 S.W.2d 564 (Tex.Crim.App.1979), a murder case, a psychiatrist found that the defendant suffered from chronic depression and disassociated phenomena prior to shooting his wife. The court held that those findings were relevant and should have been admitted on the issue of whether the defendant was guilty of only voluntary manslaughter by virtue of the influence of sudden passion. No issue of voluntary manslaughter was raised in the case before us and hence *McClure* is inapposite.

The case of *Wagner v. State*, —— S.W.2d —— No. 61601 (Tex.Crim.App.1984) not yet reported, discusses the exclusion of psychiatric evidence in a murder trial where the defendant was charged with intentionally or knowingly causing the victim's death. The court therein made the following observation:

> One of appellant's witnesses stated that appellant was not insane but that he

might have problems with impulse control and that he was aware of what was happening but that his emotional contact was a bit displaced. In *Cowles [v. State]*, *supra*, the court stated:

> [w]hen an expert witness for the defense testifies that the accused was legally sane at the commission of the act, and that the offense is not one where specific intent is an element of the crime, an offer of testimony by that witness as to the mental aberration or the emotional problems of the accused should be rejected at the guilt-innocence stage of the trial.
> 510 S.W.2d [608] at 610 [Tex.Cr.App. 1974].

The trial court correctly excluded the testimony. The ground of error is overruled.

In our case there is no question of appellant's sanity, only the state of his mind as influenced by his thoughts of the Holocaust at the time of the offense. Our appellant was charged with "intentionally and knowingly" causing the death of the deceased. The appellant argues that the jury should consider his "special" state of mind as conditioned by his Holocaust knowledge, rather than consider his plea of self-defense in the light of the standard as set out in *Kolliner* and *Jones, supra*. The rejected testimony was not relevant to any issue raised by appellant's defense. The second ground of error is overruled.

■ In the third ground of error, appellant contends that the trial court erroneously refused to grant a new trial despite evidence of jury misconduct in discussing the parole law.

In appellant's motion for new trial, he includes an affidavit from juror, Gary Burrows. The relevant portions of Mr. Burrows' affidavit are as follows:

> During the deliberations on punishment the jury discussed parole. Our knowledge to that point related to parole was based on what we had learned prior to trial through the media. However, I really didn't have any idea of how parole actually worked. Mr. Robert Palmer, an-

other juror, however, did explain it to us. He told us his son had been convicted of a hot check charge and was sentenced to serve three (3) years in the penitentiary. I believe he said his son only served fourteen (14) months. I believe he also said that his son is still on parole and must visit the parole officer periodically and allow the parole officer to visit him in his home periodically. He must pay a parole fee.

I did not have any information about how parole actually worked until Mr. Palmer outlined the above of his experience with his son. I was reassured by his discussion that Peter Werner would spend a lesser time behind bars than the time we assessed (ten years) and that sometime during his incarceration would be available for parole, and then would be subjected to supervision similar to that of probation.

The appellant relies principally on *Munroe v. State*, 637 S.W.2d 475 (Tex.Crim.App. 1982) and *Grismore v. State*, 641 S.W.2d 593, (Tex.Crim.App.1982). These cases have been overruled, along with all other cases applying art. 40.03(7) and (8) by the recently decided case of *Sneed v. State*, 670 S.W.2d 262 (Tex.Crim.App.1984). In *Sneed*, three jurors testified. One stated that she voted for five years at first, but after some discussion about a prison year being only seven months and her common knowledge about inmates being released on parole, she was influenced to vote for seven years, then eight, and finally ten years. The other juror also stated that he voted for five years on the first vote, after which someone "brought it up" that the time would probably be cut in half. He stated that he did not know the law; that none of the jurors knew, nor pretended to know the law. He surmised that it was common knowledge that prisoners were released before serving the full time assessed, but no one purported to know the exact time. He said the "discussion" was "probably" why he raised his vote finally to ten years. Still another juror testified that a "bunch of people" raised the parole question and the discussion lasted some 30 to 45 minutes.

She said no one professed to know the law, although she knew inmates were released on parole. She stated that comments on parole caused her to change her mind.

The *Sneed* court ruled that the foregoing discussions concerning parole law *did not* constitute jury misconduct, and set forth the following five-prong test:

To show that a jury's discussion of the parole law constitutes reversible error, it must be shown that there was

"(1) a misstatement of the law

"(2) asserted as a fact

"(3) by one professing to know the law

"(4) which is relied upon by other jurors

"(5) who for that reason changed their vote to a harsher punishment."

Such test shall apply to cases under either sections 7 or 8 of Article 43.03, supra. All cases to the contrary are now overruled.

Applying this five-prong test to the facts in the case at bar, Burrows' affidavit shows that *not one* of the five-prongs of the test were met. The testimony offered in our case fails to show that the "other jurors" relied upon any misstatement of the law asserted as a fact by one professing to know the law which caused them to vote for a harsher punishment. Appellant's third ground of error is overruled.

■ The appellant contends in his fourth ground of error that the trial court erred in refusing to order a mistrial after the prosecutor discussed the law on early termination of probation.

During the punishment phase of trial, the prosecutor asked the following questions, while cross-examining one of the defense's witnesses:

Questions By Mr. Hansen:

Q. Did you know he could be terminated early?

A. I don't understand what you told me.

Q. If the jury put him on ten years' probation, do you know he could be let go in three years?

Mr. Berg: Objection, Your Honor. May we approach the bench?

The court sustained appellant's objection, and instructed the jury to disregard the question. However, the court denied the appellant's motion for mistrial.

Appellant argues that the prosecutor's discussion of early termination of probation was so prejudicial and harmful that a mistrial should have been granted.

 It is well established that a discussion of parole eligibility during jury argument or witness examination generally constitutes reversible error. *Clanton v. State,* 528 S.W.2d 250 (Tex.Crim.App.1975); *Alejandro v. State,* 493 S.W.2d 230 (Tex. Crim.App.1973), *but cf. McCarter v. State,* 527 S.W.2d 296 (Tex.Crim.App.1975).

 However, not every discussion of probation will result in reversible error where the court sustains an objection and instructs the jury to disregard. In the cases cited by appellant, only one, *Alejandro,* was reversed due to improper argument. In *Alejandro,* the court found that the state's discussion of the number of probationers per probation officers in the county, was clearly outside the record, and reversed the conviction. However, in *Alejandro,* the trial court had overruled defense counsel's objections to such remarks. In two other cases cited by appellant, *Starling v. State,* 522 S.W.2d 505 (Tex.Crim. App.1975) and *Wood v. State,* 516 S.W.2d 667 (Tex.Crim.App.1974), the court did not reverse the convictions despite evidence that the prosecutor had questioned witnesses on their knowledge of the availability of probation officers.

In *Starling,* defendant failed to preserve error, and in *Wood* the error was cured by other testimony. In both cases the court found that the argument was improper because evidence outside the record was presented to the jury.

It is interesting to note that in *McCarter* the prosecutor asked appellant about his knowledge of the parole law. The court sustained a belated general objection and instructed the jury to disregard the question. The Court of Criminal Appeals held that the asking of the question, especially in view of the instruction, did not constitute reversible error. Appellant's fourth ground of error is overruled.

The judgment of the trial court is affirmed.

LEVY, Justice, dissenting.

I respectfully dissent because of a significantly different perception of Section 19.-06, Texas Penal Code (Vernon 1974), which constitutes the basis of appellant's second ground of error.

Section 19.06 provides as follows:

In all prosecutions for murder or voluntary manslaughter, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

As I read it, 19.06 directs the admissibility of *all* relevant facts and circumstances relating to the killing *and to the defendant's state of mind at the time,* whether offered by the State or by the defendant. During the first phase of the trial, to determine the guilt of the defendant, the trial court prohibited the defendant from introducing testimony of the two arresting officers who arrived at the scene of the killing very soon after the fact. The testimony of the officers directly related to the defendant's emotional condition at the time of the killing, and accordingly was explicitly authorized by 19.06.

In addition, the excluded statement was *res gestae* of the arrest. *Khoury v. State,* 669 S.W.2d 731, 734 (Tex.Crim.App.1984) held that it was reversible error to exclude the defendant's *res gestae* statement to police upon his arrest in a murder case, which explained his state of mind at the killing, relying on Tex.Code Crim.P.Ann. art. 38.22, sec. 5; *Harryman v. State,* 522 S.W.2d 512 (Tex.Crim.App.1975); *Ramos v. State,* 419 S.W.2d 359 (Tex.Crim.App.1967).

Even more glaring was the error in excluding testimony of the psychiatrist who had treated survivors of Nazi concentration camps and their descendants. Psychiatric testimony concerning the defendant's mental condition at the time of the killing, especially enlightened by the experience of Dr. Roden in treating other such patients who similarly were such descendants, would appear to me to be of considerable potential significance to the jury, and also clearly authorized by 19.06. Indeed, the exclusion of very similar psychiatric testimony was held to be reversible error under 19.06 in *McClure v. State,* 575 S.W.2d 564 (Tex.Crim.App.1979).

By virtue of its specific terms applicable to prosecutions for murder and voluntary manslaughter, *general* theories of relevancy and competency are superceded by Section 19.06. Self-defense, the most common justification asserted in such prosecutions, is always evaluated from the *particular* defendant's perception at the time, not from the theoretical "reasonable and prudent man" acting with olympian objectivity. *Kolliner v. State,* 516 S.W.2d 671 (Tex. Crim.App.1974); *Jones v. State,* 544 S.W.2d 139 (Tex.Crim.App.1976). *Jones* declared (quite consistently with prior decisions) that under the law of self-defense, a person has a right to defend from apparent danger to the same extent as he would had the danger been real, provided he acted upon a reasonable apprehension of danger *as it appeared to him from his standpoint at the time. Kolliner v. State, supra.*

Whether the trial court believed the proffered psychiatric testimony was strong, feeble, unimpeached, contradicted, sophistry, a desecration, or simply not entitled to belief, the jury under 19.06 was clearly entitled to consider it. *Kolliner, supra; Jones, supra.* The very purpose of 19.06's sweeping language was to distinguish the particular "mind of the accused at the time of the offense" from the mind of the theoretical "reasonable and prudent man," and permit the jury, as the trier of fact—not the court—to evaluate the killing in such light.

I would reverse and remand for a new trial.